## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ | ) |
| | ) |
| **MARCOS REYES,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Civil Action No. 16-10466-DJC** |
| | ) |
| **NANCY A. BERRYHILL,[1]** | ) |
| **Acting Commissioner,** | ) |
| **Social Security Administration,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |
| _____ | ) |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                    **July 26, 2017**

### I.     Introduction

Plaintiff Marcos Reyes ("Reyes") filed claims for supplemental security income ("SSI"),

R. 386,[2] and disability insurance benefits ("SSDI") with the Social Security Administration

("SSA") on March 2, 2012, R. 395.  Pursuant to the Social Security Act, 42 U.S.C. § 405(g), Reyes

brings this action for judicial review of the final decision of the Commissioner of the SSA

("Commissioner"), D. 1, issued by Administrative Law Judge ("ALJ") Sean Teehan on November

26, 2014, R. 21.  Before the Court is Reyes's motion to reverse the ALJ's decision, D. 11, and the

---

[1] Nancy A. Berryhill is now Acting Commissioner of Social Security. Pursuant to Fed. R. Civ. P. 25(d), the Court has substituted Nancy A. Berryhill for the prior Acting Commissioner Carolyn W. Colvin as Defendant in this suit.

[2] "R" refers to the Administrative Record, D. 10.

Commissioner's motion to affirm the decision, D. 17.  For reasons discussed below, the Court
DENIES Reyes's motion to reverse and GRANTS the Commissioner's motion to affirm.

## II.    Factual Background

Marcos Reyes was born on October 7, 1957 and filed for SSI on March 2, 2012.  R. 386.
In his disability application, Reyes alleged that PTSD, depression, anxiety, arthritis, obesity and
back and leg pain limited his ability to work.  R. 452.  He initially reported the onset date as
October 23, 2003, id., but later amended it to March 2, 2012, R. 438.

## III.   Procedural Background

Reyes filed an application for SSI benefits on March 2, 2012.  R. 386.  The SSA denied his
application on July 13, 2012.  R. 247.  After Reyes submitted a "Request for Reconsideration," the
SSA again denied Reyes's application on September 24, 2012.  R. 250.  On October 17, 2012,
Reyes requested a hearing before an ALJ, R. 253, which was held on February 26, 2013.  R. 224.
In a decision dated March 28, 2013, the ALJ denied Reyes's claim.  R. 233.  On May 24, 2013, the
Appeals Council remanded the case back to the ALJ.  R. 237-40.  After a hearing on October 28,
2014, the ALJ found Reyes not disabled on November 26, 2014.  R. 7-21.  The Appeals Council
denied Reyes's request for review on January 6, 2016, rendering the ALJ's November 26, 2014
decision the Commissioner's final decision.  R. 1-5.

## IV.   Discussion

### A.   Legal Standards

#### 1. Entitlement to SSI

Entitlement to SSI turns on whether the claimant has a disability, which the Social Security
Act defines as the "inability to engage in any substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to result in death or has lasted

or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A); 20 C.F.R. § 416.905(a). This impairment must be severe, rendering the claimant unable to do his or her previous work or any other gainful activity for which the claimant is qualified and which exists in the national economy. 20 C.F.R. § 416.905(a).

SSA regulations require a five-step process when determining whether a claimant has a disability. Id. § 416.920. The Commissioner may find a claimant disabled or not disabled at any step, and the case will not proceed further. Id. § 416.920(a)(4). First, if the claimant is engaged in substantial gainful activity, the Commissioner will find the claimant not disabled. Id. § 416.920(a)(4)(i). Second, the claimant is not disabled if he or she has not had a severe impairment or combination of impairments during the relevant time period. Id. § 416.920(a)(4)(ii). Third, the claimant is found disabled if the severe impairment meets or equals an impairment listed in SSA regulations. Id. § 416.920(a)(4)(iii). Fourth, the Commissioner determines the individual's residual functional capacity ("RFC"). Id. § 416.920(a)(4)(iv). The claimant is not disabled if the RFC is such that the claimant can still perform past relevant work. Id. Fifth, if the RFC, considered in conjunction with the claimant's education, work experience and age, renders the claimant unable to do any other work in the national economy, the claimant is considered disabled. Id. § 416.920(a)(4)(v).

### 2. Standard of Review

The Court may affirm, modify or reverse the decision of the Commissioner with or without remanding the case for a rehearing. 42 U.S.C. § 405(g). The Court should uphold the Commissioner's decision unless a legal or factual error was made in evaluating a particular claim. Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (citing Sullivan v. Hudson, 490 U.S. 877, 855 (1989)). The Commissioner's findings of fact are conclusive if

supported by substantial evidence. 42 U.S.C. § 405(g); Manso-Pizarro, 76 F.3d at 16. Substantial evidence exists when there is "more than a mere scintilla" supporting the conclusion, such that a reasonable mind would find the relevant evidence adequate, Richardson v. Perales, 402 U.S. 389, 401 (1971), but not when determined by "ignoring evidence, misapplying the law, or judging matters entrusted to experts," Nguyen v. Chater, 172 F.3d 31, 34 (1st Cir. 1999) (citing Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986)).

Issues of credibility and inferences drawn from the record are committed to the Commissioner, who ultimately resolves conflicts in the evidence and determines the disability status of the claimant. Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981). As such, the Court must affirm the Commissioner's decision "even if the record arguably could justify a different conclusion" if it is supported by substantial evidence. Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 144 (1st Cir. 1987) (citing Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987)). That is, the Court must uphold the Commissioner's decision "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion," even if the record could support multiple conclusions. Dedis v. Chater, 956 F. Supp. 45, 49 (D. Mass. 1997) (quoting Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991)).

### B. **Before the ALJ**

#### *1. Medical History*

##### a. Physical Impairments

###### i. Back and Knee Pain

4

Reyes's medical records reveal he was first diagnosed with chronic back pain on February 29, 2012 at McInnis Health Group ("McInnis").  R. 855-57.  Reyes stated he took Tylenol for pain, R. 856, and the only treatment plan instead was to return to the clinic as needed.  R. 857.

Reyes began seeing Anne Fitzgerald, N.P. ("Fitzgerald") on April 3, 2012 at McInnis.  R. 837.  During this visit, Reyes complained of lower back pain, leg pain and depression.  R. 838.  Reyes told Fitzgerald he sustained a work-related accident in 2006 and has experienced back, hip and thigh pain since then.  Id.  On April 19, 2012, Fitzgerald noted that Reyes's pain was "[w]ell controlled with Tylenol" and she "[s]trongly encourage[d] heat, exercise for mobility, and weight loss."  R. 827.  During a visit on May 1, 2012, Fitzgerald noted Reyes "want[ed] something stronger" than Tylenol and had begun using a cane, although he did not bring it that day.  R. 815.  Fitzgerald then prescribed Reyes Nabumetone and added bilateral knee pain to his diagnosed problems.  R. 818-19.

Reyes saw Dr. Tony Tannoury, M.D. ("Dr. Tannoury") from the Department of Orthopaedic Surgery at Boston Medical Center on November 15, 2012.  R. 990.  Reyes complained of lower back pain and bilateral lower extremity pain and Dr. Tannoury noted Reyes took Tylenol and Naprosyn for pain relief.  Id.  Dr. Tannoury also reported that Reyes walked with the aid of a cane, had an antalgic gait and experienced a decreased range of motion "with pain at the extremes of range of motion" during a hip exam.  Id.   X-rays revealed "L4-L5 spondylolisthesis, grade 2, as well as hip arthritis."  Id.  Dr. Tannoury recommended physical therapy and a follow-up in three months.  R. 991.

On January 31, 2013, Fitzgerald observed there were no marked changes in Reyes's back pain and encouraged gentle exercise.  R. 1020, 1024.  On April 30, 2013, Fitzgerald noted that Reyes had not yet begun physical therapy as recommended by Dr. Tannoury.  R. 1198.  There was

5

then a nine-month gap in Reyes's visits and he returned to see Fitzgerald in February 2014.  R. 1298.  Fitzgerald reported no marked changes in Reyes's pain pattern and advised him to resume taking Nabumetone for severe pain.  R. 1303.  Reyes continued to see Fitzgerald, who consistently noted no marked changes in his back pain and encouraged Reyes to take Nubumetone as needed and engage in more movement or join a gym.  See, e.g., R. 1198-1201, R. 1258-59, R. 1289.

## ii.   Obesity

Fitzgerald noted Reyes's obesity during their first visit on April 3, 2012.  R. 837-38.  She encouraged Reyes to eat smaller portions and walk.  R. 841.  Fitzgerald explained to Reyes on April 19, 2012 that his multiple health problems were related to obesity and she strongly encouraged him to exercise.  R. 827.  On May 15, 2012, Fitzgerald noted Reyes had gained twenty pounds in approximately six weeks, R. 803-04, and she again explained the associated health risks, R. 807.  Fitzgerald repeatedly emphasized the need to lose weight and exercise throughout Reyes's treatment.  See, e.g., R. 1021, 1201, 1259, 1300.

## b.  Mental Impairments

Reyes began psychiatric treatment at Boston Medical Center on April 13, 2012 with Dr. Leah Bauer, M.D. ("Dr. Bauer").  R. 829.  Reyes said he felt depressed and anxious about readjusting to society after his release from incarceration and people discovering his sex offender status.  Id.  Dr. Bauer commented Reyes was "future oriented and motivated to seek out services and opportunities for services and employment."  Id.  Dr. Bauer also noted that Reyes participated in a weekly sex offender therapy group held by Suffolk Superior Court.  Id.

Shortly thereafter, Reyes began treatment with Dr. Alex Keuroghlian, M.D. ("Dr. Keuroghlian").  On July 18, 2012, Dr. Keuroghlian diagnosed Reyes with anxiety and an adjustment disorder.  R. 778.  Dr. Keuroghlian determined Reyes's problem had worsened on

August 1, 2012, diagnosing him with major depressive disorder and prescribing Zoloft.  R. 770-71.  Reyes's mood and ability to focus and retain information improved after he began taking the medication.  R. 1036.

Reyes then saw Dr. Michael Nevarez, M.D. ("Dr. Nevarez") on May 1, 2013.  R. 1191.  Dr. Nevarez reported Reyes had not taken Zoloft for several months and advised him to re-start at 100 mg daily.  R. 1191-92.  Reyes again stopped taking Zoloft and complained of anxiety and depression.  R. 1292.  In February 2014, Dr. Derri Shtasel, M.D. ("Dr. Shtasel"), who had supervised some of Reyes's psychiatric treatment in 2012, see, e.g., R. 791, 800, began to oversee Reyes's psychiatric care, prescribing Zoloft to Reyes and recommending therapy, R. 1296.

c.  Medical Source Statements and Reports

Fitzgerald submitted two letters to the Boston Housing Authority on Reyes's behalf.  On October 12, 2012, Fitzgerald sent a letter stating that Reyes "has a disability that is expected to be of long and continued duration and it limits his ability to work or perform one or more activities of daily living."  R. 1164.  Fitzgerald noted that Reyes experienced chronic back, knee and hip pain, used a cane and took anti-inflammatory medication.  Id.  Fitzgerald also commented that Reyes reported shortness of breath and was seeing a psychiatrist for ongoing major depression and anxiety.  Id.  On May 7, 2013, Fitzgerald signed an additional letter in support of Reyes's housing application.  R. 1182-83.  In this letter, Fitzgerald listed chronic back, hip and knee pain, emphysema, acid reflux, high blood pressure and obesity as Reyes's medical problems, in addition to depression and anxiety as psychiatric problems.  Id.

Only one of Fitzgerald's medical source statements was co-signed by a doctor, Phillip Pulaski, M.D. ("Dr. Pulaski").  R. 1050.  On February 5, 2013, Dr. Pulaski and Fitzgerald signed an "Addendum—Residual Functional Capacity—Physical" ("Addendum").  Id.  Dr. Pulaski and

Fitzgerald stated that Reyes would need to lay down for twenty to thirty minutes during the day and would be expected to miss at least three days of work a month.  Id.  In response to the question, "Do you believe your patient is disabled from competitive substantial gainful employment?" Fitzgerald and Dr. Pulaski opined, "Yes, given his multiple medical and psychiatric problems, it would be very difficult for Mr. Reyes to work on a regular basis," noting that Reyes "has problems with depression and focusing."  Id.

The Addendum was attached to a "Physical Capacities Evaluation" ("Checklist"), R. 1051, also completed on February 5, 2013 by Fitzgerald.  See R. 18.  The Checklist indicated Reyes could lift or carry six-to-ten pounds occasionally and never anything heavier.  Id.  It also denoted Reyes could sit for one hour at a time and stand or walk for thirty minutes at one time.  Id. Additionally, the Checklist indicated Reyes could stoop, bend and reach occasionally but crouch, crawl, climb and squat "not at all."  Id.  Finally, a hand-written comment observed that Reyes had emphysema and thus should not be exposed to irritants.  Id.

In February 2013, Dr. Nevarez completed a "Mental Residual Functional Capacity Form." R. 1054.  First, Dr. Nevarez determined that Reyes's ability to maintain attention and concentration for extended periods of time, sustain an ordinary routine without special supervision, set realistic goals and make plans independent of others precluded performance for 15% or more of an 8-hour workday.  R. 1054-55.  Next, Dr. Nevarez stated that Reyes's symptoms precluded performance for 10% of an 8-hour workday in the following areas:  understanding, remembering and carrying out detailed instructions; performing activities within a schedule; maintaining regular attendance and being punctual within customary tolerances; working in coordination with or in proximity to others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an

unreasonable number and length of rest periods; interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; responding appropriately to change in work settings; and being aware of normal work hazards and taking precautions.  Id.  Dr. Nevarez also assessed that Reyes's symptoms precluded performance for 5% of an 8-hour workday in regard to the ability to make simple work related decisions, to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness and to travel in unfamiliar places.  Id.  Finally, Dr. Nevarez concluded Reyes's symptoms did not preclude his ability to remember locations and work-like procedures, understand, remember and carry out very short and simple instructions and ask simple questions.  Id.

Reyes's most recent medical reports in the record are from March 2014, see R. 1254, 1270, as he cancelled or missed several appointments in May 2014, e.g., R. 1240.  On March 26, 2014, Reyes told Dr. Shtasel he experienced physical pain in his hips and knees.  R. 1270.  Reyes also complained of joint pain and arthritis.  Id.  As to Reyes's pain, Dr. Shtasel noted that Reyes "uses [N]arprosyn [sic] which is helpful."  Id.  The next day Reyes saw Fitzgerald, who noted Reyes complained of hip and leg pain.  R. 1255.  Fitzgerald observed Reyes was "walking a lot . . . [and] carrying heavy bag" in addition to reporting that Reyes talked "again about joining a gym so he can workout & shower" but had yet to attend physical therapy.  Id.  Fitzgerald encouraged Reyes to keep his physical therapy appointment and "avoid overdoing it but walk daily."  R. 1258.

### 2.  ALJ Hearing

During the administrative hearing held on October 28, 2014 the ALJ heard testimony from Reyes and vocational expert ("VE") Crystal Hodgkins.  R. 10.

### a.  Reyes's Testimony

Reyes testified to his educational status and history of incarceration.  R. 35, 37-38.  Reyes confirmed he served fifteen years for rape in 1987, ten years for "robbery, stolen car, ABDW, possession of Class C, failure to register as a sex offender, and then counterfeiting" and "three years for accosting and assault and battery," being released on February 21, 2012.  R. 37-38.  Reyes also testified extensively about his employment history.  R. 41-51.  Additionally, Reyes stated he had been homeless for a year and a half, R. 58, staying at a shelter on especially cold nights, R. 61, and he received $92 in transitional assistance and $189 in food stamps each month, R. 52.  Reyes told the ALJ he used public transportation when possible, occasionally took the commuter rail to visit family on the North Shore, did laundry when he could afford it, sometimes carried a ten-to-fifteen pound bag, walked to Government Center and Burger King or McDonald's, sat when needed and slept outside between Tremont Street and Washington Street.  R. 62-67.  Reyes also stated he used a cane three or four times a week, although not prescribed by a doctor, and he did not have it with him on the day of the hearing.  R. 76.

When the ALJ asked why Reyes believed he was disabled, Reyes responded he had "hip problems, back problems, knee problems . . . [his] feet swell up, walking problems, climbing problems" and he had arthritis, depression, anxiety, PTSD and "focusing" issues.  R. 53.  In regard to his obesity, Reyes testified that he weighed approximately 280 pounds.  R. 52.  Reyes stated Fitzgerald was his primary physician, R. 56, and he took Tylenol, Motrin and Naprosyn for physical pain and Zoloft for psychiatric problems, R. 53-54.  Reyes said he hoped to attend barber school but claimed his weight, age and the limited time he could spend on his feet prevented him from fulfilling that aspiration.  R. 56.  Reyes also confirmed he had a history of substance abuse, but had been "clean" since 2006.  R. 57-58.

b.  VE's Testimony

Following Reyes's testimony, the ALJ posed a hypothetical to the VE:

> Assume if you will that a hypothetical person's [sic] of the same age, education, language, and work background as the claimant.  Further assume that if there's work that such a person could perform, it would be subject to the following limitations.  This person would be able to lift and carry 50 pounds occasionally and 25 pounds on a frequent basis, would be able to sit for six hours out of an eight-hour workday, stand and/or walk for six hours out of an eight-hour workday.  This person would be able to frequently climb stairs and ramps, occasionally ropes, ladders, and scaffolds, would frequently be able to – well, excuse me, would occasionally be able to balance, would occasionally be able to stoop, crouch, kneel, and crawl.  And this person would be able to understand and carry out instructions which would be consistent with an SVP of 3, would be able to maintain concentration, persistence, and pace for two-hour increments over an eight-hour workday over a 40-hour workweek.  This person would be able to relate to coworkers and supervisors on a superficial interactional basis and with no tandem work, and only occasional contact with the general public.  Would such a person be able to perform any of the past work of the claimant?

R. 79-80.  The VE determined that this individual would be able to do Reyes's past work of a production helper, id., and could also work as an industrial laundry worker, dishwasher or janitor, R. 81, all of which require medium exertion, R. 79, 81.  The ALJ later asked if the same individual could perform these jobs if he were limited by having to avoid concentrated exposure to unprotected heights and pulmonary irritants.  R. 83.  The VE responded that this individual would still be able to work as a production helper and could also work as a food service worker, which requires medium exertion.  Id.

The ALJ then posed a second hypothetical to the VE:

> [The] second hypothetical person has the following limitations.  This person would be able to sit for one hour at a time for a total of six hours in an eight-hour workday, stand and/or walk for 30 minutes at a time for a total of six hours in an eight-hour workday, would occasionally be able to lift and carry 10 pounds, and would occasionally be able to stoop and bend and reach, but would be unable to squat, crouch, crawl, or climb, and would have moderate limitations in driving and would have total inability to work with unprotected heights, moving and dangerous machinery, exposure to marked changes in temperature and humidity, and exposure to pulmonary irritants.

11

R. 81-82.   The VE concluded that this hypothetical individual would be able to work as a surveillance system monitor, inspector of small electronic components under a microscope and packer of electronics, all of which are sedentary in nature and have been done with a "sit/stand option."  R. 82.

### 3.   Findings of the ALJ

The ALJ followed the SSA's five-step analysis.  See 20 C.F.R § 416.920.  At step one, the ALJ found Reyes had not engaged in substantial gainful activity since March 2, 2012.  R. 12.

At step two, the ALJ found Reyes had the severe impairments of degenerative disc disease of the lumbar spine, obesity, anxiety disorder and depressive disorder.  Id.  The ALJ also found Reyes had the non-severe impairment of bilateral hip disorder.  Id.

At step three, the ALJ determined Reyes's impairments did not meet the severity of those listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  Id.  While the ALJ "specifically considered" the criteria regarding disorders of the spine, he determined "no medical evidence of record indicate[d] that the claimant has a compromise of either the nerve root or the spinal cord."  R. 13.  In doing so, the ALJ considered the opinions of the state agency medical consultants who evaluated the issue and reached the same conclusion.  Id.  The ALJ also determined Reyes had mild restrictions in activities of daily living and moderate difficulties in social functioning and concentration, thus rendering his mental impairments non-severe.  Id.

The ALJ then considered all of Reyes's symptoms and the extent to which these symptoms could reasonably be accepted as consistent with the objective medical evidence, opinion evidence

and other evidence on record to determine Reyes's RFC.  R. 14.  The ALJ found Reyes had the

RFC to perform medium work,[3] noting that:

> [T]he claimant has the residual functional capacity to perform medium work as
> defined in 20 CFR § 416.967(c) except the claimant could frequently climb stairs
> and ramps and occasionally climb ropes, ladders and scaffolds.  The claimant would
> occasionally be able to balance, stoop, crouch, kneel and crawl.  The claimant
> would be able to understand and carry out instructions consistent with a Specific
> Vocational Preparation of 3.  The claimant is able to maintain concentration,
> persistence and pace in performance of those tasks for 2 hour-increments over an
> 8-hour workday, in a 40-hour workweek.  The claimant is able to relate superficially
> to coworkers and supervisors but cannot perform tandem tasks.  The claimant is
> able to have occasional contact with the general public.

Id.  In making this finding, the ALJ noted that while Reyes's medically determinable impairments

could reasonably be expected to cause Reyes's alleged symptoms, Reyes's statements concerning

the intensity, persistence and limiting effects of these symptoms were "not entirely credible."  R.

17.  See 20 C.F.R. § 416.929(c)(1).

The ALJ determined that Reyes had no past relevant work at step four.  R. 19.  At step five,

the ALJ considered Reyes's "approaching advanced age," high school education, previous work

experience and RFC to determine there were jobs existing in significant numbers in the national

economy that Reyes could perform.  R. 19.  Accordingly, the ALJ found Reyes was not disabled.

R. 20.

### C.  Reyes's Challenges to the ALJ's Findings

Reyes contends that the ALJ's decision was not supported by substantial evidence.  D. 12

at 11.  Specifically, Reyes argues:  (1) the ALJ should have given controlling weight to Reyes's

medical source opinion; (2) the ALJ improperly adopted his own lay interpretation of the medical

---

[3] Medium work is defined as "requiring lifting no more than 50 pounds at a time with frequent
lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. § 416.967(c).

evidence and instead should have sought additional evidence from acceptable medical sources; and (3) there was no support for the finding that Reyes could perform medium work.  Id. at 12.

> 1. *The ALJ Did Not Err in Determining the Weight Given to the Medical Source Opinions*

Reyes argues that the "ALJ should have given controlling weight to the claimant's treating medical source opinion."  Id.  Reyes contends that the medical record contained only one "uncontroverted medical opinion" regarding the exertional limitations of Reyes and it supports an exertional finding of "sedentary."  Id. at 13.

An ALJ may give controlling weight to a treating source[4] or other acceptable medical source's opinion, as these sources are most able to "provide a detailed, longitudinal picture of the claimant's medical impairments."  Rohrberg v. Apfel, 26 F. Supp. 2d 303, 309 (D. Mass. 1998) (citation and internal quotation marks omitted); 20 C.F.R. § 416.927(c)(2).  The regulations, however, do "not mandate assignment of some unvarying weight to every report in every case," Guyton v. Apfel, 20 F. Supp. 2d 156, 167 (D. Mass. 1998) (citation and internal quotation marks omitted), as the ALJ will "always consider the medical opinions in [the] case record together with the rest of the relevant evidence," 20 C.F.R. § 416.927(b).  Furthermore, an ALJ cannot give an opinion controlling weight unless it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and substantial evidence in the record.  20 C.F.R. § 416.927(c)(2); Social Security Ruling (SSR) 96-2p: Giving Controlling Weight to Treating Source Medical Opinions, 61 Fed. Reg. 34,490 (July 2, 1996).[5]  Consequently, an ALJ may give less weight to an

---

[4] A treating source is an "acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]."  20 C.F.R. § 416.927(a)(2).

[5] The Court notes that since the filing of this action, the Commissioner has rescinded SSR 96-2p for claims filed on or after March 27, 2017.  See Rescission of Social Security Rulings 96-2p,

opinion where it is "inconsistent with other evidence in the record." Shields v. Astrue, No. 10-cv-10234-JGD, 2011 WL 1233105, at *7 (D. Mass. Mar. 30, 2011) (quoting Arruda v. Barnhart, 314 F. Supp. 2d 52, 72 (D. Mass. 2004)); see Shaw v. Sec'y of Health & Human Servs., No. 93-2173, 1994 WL 251000, at *3 (1st Cir. 1994) (explaining that "[w]hen a treating doctor's opinion is inconsistent with other substantial evidence in the record, the requirement of 'controlling weight' does not apply").

The ALJ must consider several factors when determining the proper weight to give a medical opinion not entitled to controlling weight:  (1) length of the treatment relationship and frequency of examination; (2) nature and extent of the treatment relationship; (3) support of the opinion by medical signs and laboratory findings; (4) consistency of the opinion with the record as a whole; (5) specialization of the treating source; and (6) other factors that may support or contradict the medical opinion.  Avery v. Astrue, No. 11-30100-DJC, 2012 WL 4370270, at *10 (D. Mass. Sept. 21, 2012) (explaining that the ALJ may give less weight to a treating source's opinion if it is inconsistent with the record as a whole); 20 C.F.R. § 416.927(c).  While these factors apply to the evaluation of medical opinions from acceptable medical sources, they can also be used to assess opinion evidence from other medical sources.  Social Security Ruling (SSR) 06-03p: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims, 71 Fed. Reg. 45,593 (August 9, 2006).[6]

An ALJ must give "good reasons" for the weight assigned to a medical source opinion, 20 C.F.R. § 416.927(c)(2), although  "the regulations do not require an ALJ to expressly state how each factor was considered,"  Bourinot v. Colvin, 95 F. Supp. 3d 161, 177 (D. Mass. 2015).  The

---

96-5p, and 06-3p, 82 Fed. Reg. 15,263 (Mar. 27, 2017).  The Court still considers SSR 96-2p, as it was in effect at the time this claim was filed.

[6] See supra note 5.

ALJ's reasons must be "sufficiently specific to make clear . . . the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight," Alberts v. Astrue, No. 11-11139-DJC, 2013 WL 1331110, at *8 (D. Mass. Mar 29, 2013), because if "the ALJ fails to explicitly indicate the weight given to all relevant evidence, the reviewing court cannot affirm the Commissioner's decision," Nguyen v. Callahan, 997 F. Supp. 179, 182 (D. Mass. 1998) (citation and internal quotation marks omitted).  The ALJ need not, however, discuss all factors under 20 C.F.R. § 416.27(c).  Alberts, 2013 WL 1331110, at *8-9.

Contrary to Reyes's assertions, the ALJ considered multiple medical source opinions. First, the ALJ evaluated opinion statements from Fitzgerald, a nurse practitioner, whom the ALJ noted was not an acceptable medical source, and gave her opinions little weight.  R. 19.  Next, the ALJ determined that Fitzgerald's only opinion cosigned by an acceptable medical source, Dr. Pulaski, was inconsistent with the totality of the evidence and thus gave it little weight.  R. 18. Finally, the ALJ considered the reports of Dr. Shtasel, also an acceptable medical source, when evaluating the credit due to Fitzgerald and Dr. Pulaski's opinions and concluded that Dr. Shtasel's observations were more consistent with the entire record.  Id.  Based on the evidence before the ALJ, he did not err in assigning the weight given to each opinion.

A medical source opinion may come from an acceptable medical source or other health care provider.  SSR 06-03p, 71 Fed. Reg. 45,593.  Nurse practitioners are not considered acceptable medical sources.  Id.; see Hustead v. Astrue, No. 08-cv-30119-KPN, 2009 WL 1259132, at *4 (D. Mass. May 6, 2009) (noting "that the ALJ was actually precluded from giving controlling weight to Nurse Stewart's residual functional capacity assessment because she is not an 'acceptable medical source'"); 20 C.F.R. § 416.902(a)(7) (explaining that a licensed advanced practice registered nurse is not considered an acceptable medical source for claims filed before

March 27, 2017).  Only acceptable medical sources can be considered treating sources whose medical opinions may be given controlling weight, although an ALJ should consider opinions of other health care providers, such as nurse practitioners, when evaluating "key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."  SSR 06-03p, 71 Fed. Reg. 45,593.  Here, the ALJ properly noted Fitzgerald was a nurse practitioner and then appropriately considered this factor, among others, when determining how much weight to assign her opinion.

In assessing relevant factors, the ALJ provided good reasons for not giving Fitzgerald's opinions controlling weight and his determinations were supported by substantial evidence.  In particular, the ALJ considered the lack of supporting laboratory findings and inconsistencies between Fitzgerald's opinions and other evidence in the record.  R. 19.  Specifically, the ALJ observed that "the claimant stated that he was walking a lot and carrying a heavy bag," R. 16; see R. 764, 1266, and was told to "watch what he eats, go to the gym and attempt to lose weight," R. 17; see R. 786, 796, 806, 818, 1036, 1259.  This evidence, the ALJ noted, was inconsistent with someone as physically limited as Fitzgerald presented.  R. 18.  The ALJ also acknowledged that Fitzgerald's October 16, 2016 letter stated that Reyes used a cane, but he determined the "claimant does not require the use of a cane and that this treatment was not prescribed by a medical doctor."  R. 19.  The ALJ came to this conclusion in part because "the claimant appeared at his hearing without his cane and stated that [he had left it at another's home] . . . [which] provide[s] strong support for a finding that the claimant does not require the use of an assistive device."  R. 17.  Additionally, the ALJ noted Fitzgerald said Reyes had breathing restrictions, which was inconsistent with medical evidence showing "pulmonary function tests conducted on October 8, 2012 were largely normal and reflect that the claimant does not have significant pulmonary

restrictions." R. 19. Furthermore, the ALJ determined Fitzgerald's May 2013 statement was conclusory, as she repeated her assessment of Reyes's physical impairments from her October 16, 2012 letter and did not provide a functional assessment of Reyes's limitations or ability to work. Id. Because Fitzgerald's letters were inconsistent with the totality of the evidence and lacked the support of objective medical tests, the ALJ properly assigned them little weight and stated specific, clear reasons for doing so.

Only the February 5, 2013 Addendum and Checklist were co-signed by an acceptable medical source, Dr. Pulaski. R. 18. The ALJ assigned this opinion little weight because he found it "inconsistent with the totality of the evidence," specifically reports that Reyes carried a heavy bag, walked a lot and was advised to exercise. Id. The ALJ determined that these "statements and medical records indicate the claimant has not presented in a manner consistent with someone who is as limited as opined in the medical source statement," which held Reyes to less than sedentary work. Id. The ALJ also noted that this medical source statement was eighteen months old at the time of the hearing and there were no other treatment records from Dr. Pulaski to support this opinion. Id. Additionally, the ALJ observed that one of Reyes's treating doctors, Dr. Shtasel, did not note any significant physical limitations during her most recent evaluation of Reyes and it was "very unlikely that the claimant could have this level of physical functioning limitations and yet treating source medical records from the first half of 2014 would fail to note any physical functioning limitations." Id.

The Court also notes that Dr. Pulaski and Fitzgerald's joint medical source statement was a preprinted checklist. See R. 1051. The First Circuit has observed that "[s]uch reports often contain little more than brief conclusory statements or the mere checking of boxes denoting levels of residual functional capacity, and accordingly are entitled to relatively little weight." Berrios

Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 431 (1st Cir. 1991); Frey v. Bowen, 816

F.2d 508, 515 (10th Cir. 1987) (noting that "[s]uch evaluation forms, standing alone,

unaccompanied by thorough written reports or persuasive testimony, are not substantial

evidence"). The conclusory nature of this form, when unsubstantiated by other evidence in the

record, supports the ALJ's decision to afford it less weight. Because the ALJ considered a variety

of factors when evaluating Dr. Pulaski's opinion, such as the length and frequency of the treatment

relationship, support of objective clinical and laboratory tests and consistency with the entire

record, see 20 C.F.R. § 416.927(c), and he articulated clear and specific reasons for his conclusion,

the ALJ did not err in assigning Dr. Pulaski's opinions little weight.

> 2.   *The ALJ Did Not Err in Not Seeking Additional Evidence from Acceptable*
>      *Medical Sources*

Reyes argues that even if the ALJ was justified in assigning little weight to the medical

source opinions in the record, the ALJ was not permitted to render his own lay opinion regarding

the significance of the medical findings. D. 12 at 13. Reyes contends that "[t]here must be a

medical basis for the ALJ's determination rather than adopting his own interpretation of the

medical evidence." Id. Reyes claims, therefore, that the ALJ was required to develop the record

by recontacting the medical sources in the record or obtaining opinions from a medical expert upon

which the ALJ could base his conclusion. Id. at 12-13.

The determination of a claimant's RFC is the ALJ's responsibility. 20 C.F.R.

§ 416.927(d)(2). An ALJ is generally not qualified to interpret raw data in a medical record,

Manso-Pizarro, 76 F.3d at 17, nor can an ALJ "ignore medical evidence or substitute his own

views for uncontroverted medical opinion," Nguyen, 172 F.3d at 35. As such, "an expert's RFC

evaluation is ordinarily essential unless the extent of functional loss, and its effect on job

performance, would be apparent even to a lay person." Manso-Pizarro, 76 F.3d at 17 (citing

<u>Santiago v. Sec'y of Health & Human Servs.</u>, 944 F.2d 1, 7 (1st Cir. 1991)).  Consequently, an ALJ can "render a commonsense judgment about functional capacity" without a physician's assessment when "the medical evidence shows relatively little physical impairment."  <u>Id.</u>  That is, an ALJ may make functional capacity determinations based on medical findings so long as he "does not overstep the bounds of a lay person's competence and render a medical judgment." <u>Gordils v. Sec'y of Health & Human Servs.</u>, 321 F.2d 327, 329 (1st Cir. 1990).  As such, a "finding that [the] claimant does not suffer from any impairment posing severe or significant *exertional* restrictions would obviate the need for a medical assessment of exertional residual functional capacity," <u>Perez v. Sec'y of Health & Human Servs.</u>, 958 F.2d 445, 446-447 (1st Cir. 1991) (emphasis in original), and the ALJ can instead look to a qualitative assessment of the medical evidence, <u>Manso-Pizarro</u>, 76 F.3d at 17, and consider non-medical evidence in the record, <u>see</u> <u>Gordils</u>, 321 F.2d at 330, to determine a claimant's RFC.

Here, the ALJ assessed the medical and nonmedical evidence in the record to determine that Reyes did not suffer from an impairment imposing significant exertional restrictions.  In particular, the ALJ considered statements that Reyes could lift up to fifteen pounds, get ready in the morning, shop, spend time at coffee shops and use public transit.  R. 15.  The ALJ also evaluated Reyes's use of a cane to ambulate, observing that Reyes did not have it at the hearing and it was not prescribed by a medical professional.  R. 16.  Additionally, the ALJ gave extensive consideration to medical reports, many of which noted that Reyes had a normal gait.  <u>Id.</u>  While observing that medical examinations reported normal spine mobility and no tenderness, the ALJ took into account Reyes's statement that walking long distances exacerbated his pain and Tylenol relieved it.  <u>Id.</u>  The ALJ further noted that medical professionals told Reyes on multiple occasion to watch what he ate, go to the gym and try to lose weight.  R. 17.  These recommendations suggest

Reyes could be physically active and therefore "the record contains no indication that the claimant's obesity significantly impairs his physical functioning." Id. The ALJ also considered Dr. Tannoury's diagnosis, which stated Reyes had "grade 2 anterolisthesis of the L4 on L5." R. 16. While this x-ray examination and consequential diagnosis could constitute raw data in a medical record, Dr. Tannoury recommended only physical therapy as treatment, id., which suggests little physical impairment even to a layperson. The ALJ further explained that the lack of evidence indicating Reyes's condition worsened from 2013 to 2014 reinforced the conclusion that Reyes's exertional limitations were relatively mild, as Reyes continued with only the same conservative treatment of Tylenol and Naprosyn and did not pursue physical therapy. R. 16. Because of the substantial evidence supporting mild exertional restrictions, the ALJ properly rendered a commonsense judgment about Reyes's RFC without stepping beyond the bounds of a lay person's competence.

Generally, an ALJ must recontact a treating physician or seek additional information only if the evidence from a physician is inadequate for the ALJ to make a disability determination. Cox v. Astrue, No. 08-cv-10400-DPW, 2009 WL 189958, at *6 (D. Mass. Jan. 16, 2009); 20 C.F.R. § 416.912(e). Contrary to Reyes's assertions that SSA regulations require an ALJ to recontact medical sources or other experts, see D. 12 at 16-17, SSA regulations state what the ALJ may do to develop the record if deemed necessary. See 20 C.F.R. § 416.920(b). An ALJ is not required to recontact treating physicians when "the aspect of [the treating source's] report that the ALJ found inadequate was not the medical assessment, but rather the opinion . . . that the claimant is totally disabled" because such conclusions "are not medical findings." Cox, 2009 WL 189958, at *8 (citation and internal quotations marks omitted). That is, "it is not the rejection of the treating physician's opinion that triggers the duty to recontact the physician; rather it is the inadequacy of

the 'evidence' the ALJ 'receive[s] from [the claimant's] treating physician' that triggers the duty."

White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2001) (alternations in original) (citation omitted).

Furthermore, "where the evidence as a whole contains substantial evidence to support an ALJ's

findings, he is not required to re-contact a treating source."  Nichols v. Astrue, No. 10-cv-11641-

DPW, 2012 WL 474145, at *11 n.5 (D. Mass. Feb. 13, 2012).  It is only "[w]here the evidence is

inconsistent or insufficient to enable the ALJ [to] make a decision" that the ALJ may recontact

medical sources or seek additional evidence from another medical source.  Shaw, 1994 WL

251000, at *5.

    Here, the ALJ did not find the medical opinions so incomplete that they could not be

considered.  Rather, the ALJ considered Fitzgerald and Dr. Pulaski's opinions complete and

concluded they should be given little weight because "the medical evidence of record does not

support that the claimant's physical impairments limit his ability to work beyond the limitations

noted in the residual functional capacity."  R. 19.  Furthermore, the ALJ relied on Dr. Shtasel's

report which "[did] not note any significant physical functioning limitations in [the] most recent

evaluation of the claimant."  R. 18.  The ALJ concluded it was unlikely Dr. Shtasel would fail to

note any physical functioning limitations if the limitations were as severe as alleged.  Id.  Thus, it

was not the evidence from Fitzgerald and Dr. Pulaski that the ALJ found insufficient, but rather

their opinion of Reyes's exertional limitations and disability status that the ALJ disagreed with.

Accordingly, the ALJ had no duty to recontact them.

    The ALJ instead relied on the totality of the evidence to make a determination of Reyes's

disability status.  Here, Reyes's record before the ALJ was "voluminous, detailed, and complex,"

as it contained hundreds of pages of medical reports from a number of different sources and several

22

descriptions of Reyes's daily activities.  Evangelista, 826 F.2d at 140.  Accordingly, the ALJ had

no duty to seek additional medical source opinions regarding Reyes's functional limitations.

### 3. Substantial Evidence Supports the ALJ's Determination that Reyes Could Perform Work at a Medium Exertional Level

Reyes argues that "there is no support for the finding that Mr. Reyes retained the ability to

perform work at the medium exertional level."  D. 12 at 12.  He further claims that his daily

activities are not "pertinent to the ability to be gainfully employed full time at a competitive

position" and the ALJ should not have considered them.  Id. at 13.  Finally, Reyes contends that

"the vocational testimony at the hearing is invalid as it is based on an unsupported premise"

because no medical source opinion supported a medium RFC finding.  Id. at 15.

A claimant's RFC is the most he can do despite his exertional and non-exertional

limitations.  20 C.F.R. § 416.945(a)(1).  A finding that the claimant's impairment could reasonably

be expected to produce the alleged symptoms does not determine the limiting effects of the

claimant's impairments, nor does it suffice to declare a claimant disabled.  See 20 C.F.R.

§ 416.945(e).  The ALJ must consider all limiting effects, as indicated by medical and nonmedical

evidence, to determine a claimant's RFC because pain or other symptoms may cause limitations

beyond or less than that "which can be determined on the basis of the anatomical, physiological or

psychological abnormalities considered alone."  Id.  That is, "someone with a low back disorder

may be fully capable of the physical demands consistent with those of sustained medium work

activity, but another person with the same disorder, because of pain, may not be capable of more

than the physical demands consistent with those of light work activity."  Id.  Once the ALJ

determines that a claimant suffers from an impairment, the question becomes to what extent it "in

fact restricts [the claimant's] residual functional capacity."  Rose v. Shalala, 34 F.3d 13, 19 (1st

Cir. 1994).

An ALJ assesses a claimant's RFC based on all relevant evidence in the record, including statements from medical sources, descriptions of limitations and observations of impairments. 20 C.F.R. § 416.945(a)(3). This includes: (1) medical history, signs and laboratory findings; (2) the effects of treatments; (3) reports of daily activities; (4) lay evidence; (5) recorded observations; (6) medical source statements; (7) effects of symptoms reasonably attributed to a medically determinable impairment; (8) evidence from attempts to work; and (9) need for a structured living environment. Social Security Ruling (SSR) 96-8p: Assessing Residual Functional Capacity in Initial Claims, 61 Fed. Reg. 34,474 (July 2, 1996).

Here, the ALJ concluded Reyes's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but Reyes's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible because "these alleged limitations were not supported in the medical evidence of record." R. 17. The ALJ also pointed to substantial nonmedical evidence to support the conclusion that Reyes could perform medium exertional work. Specifically, the ALJ determined Reyes had only "mild" restrictions in his activities of daily living, in part because of Reyes's testimony regarding his typical day and his statement to physicians that he performed activities of daily living independently. R. 13. Furthermore, the ALJ noted that medical records showed Reyes's "gait and physical condition was repeatedly observed to be normal" and he "largely [took] over the counter medication and [] followed a course of conservative treatment." R. 17. Additionally, the ALJ stated that medical records showed Reyes was working with vocational rehabilitation experts to find work and Reyes's "difficulty in finding employment appears to be more related to his significant criminal record than his physical and mental impairments." Id. As such, the ALJ's RFC assessment did "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical

facts and nonmedical evidence" and was supported by substantial evidence.  Social Security

Ruling (SSR) 96-7p:  Evaluation of Symptoms in Disability Claims, 61 Fed. Reg. 34,483 (July 2,

1996).[7]

    Reyes also argues that the ALJ's consideration of his daily activities was improper.  R. 13.

Reyes relies on Dedis, 956 F. Supp. 45, and Rohrberg, 26 F. Supp. 2d 303, among others, to support

his claim that "the [c]ourts have found that sporadic activities are not indicative of the ability to

perform substantial gainful activity without an explanation."  D. 12 at 13.  Reyes, however,

misconstrues the application of these cases.  Rohrberg states that an "ALJ must also

comprehensively consider a claimant's daily activities" when determining a claimant's RFC and

include "a discussion of why reported daily activity restrictions are or are not reasonably consistent

with the medical evidence."  Rohrberg, 26 F. Supp.2d at 308 (citing Avery v. Sec'y of Health &

Human Servs., 797 F.2d 19, 28-29 (1st Cir. 1986)).  This discussion should provide a "specific

explanation or reference to supporting evidence in the record" because "[e]xamining the claimant's

daily activities helps to shed light on the veracity of the claimant's claims of pain and illuminate

an RFC determination."  Id. at 309.  In Dedis, the ALJ questioned the claimant about his daily

activities, functional restrictions, medications, prior work record and the frequency and duration

of pain.  Dedis, 956 F. Supp. at 47.  While the court there stated that "a claimant's ability to

participate in limited household chores, in and of itself, does not prove he has the ability to perform

substantial gainful activity," it nonetheless determined there was substantial evidence to support

the ALJ's RFC decision.  Id.; see Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010)

---

[7] The Court notes that since the filing of this action, SSR 96-7p has been superseded by SSR 16-3p for claims filed on or after March 16, 2016.  See Social Security Ruling 16-3p: Titles II and XVI: Evaluation of Symptoms in Disability Claims, 81 Fed. Reg. 14,166 (Mar. 16, 2016).  The Court still considers SSR 96-7p, as it was in effect at the time this claim was filed.

(noting that performance of household chores should be considered when determining credibility); Berrios Lopez, 951 F.2d at 429 (concluding claimant's complaints of pain were not credible because claimant could drive and walk without assistance).

Here, the ALJ relied upon Reyes's daily activities to illustrate inconsistencies in the medical record. Specifically, the ALJ noted Reyes said he walked a lot, could lift up to fifteen pounds, got ready in the morning, went shopping, spent time at coffee shops, used public transit and attended group therapy. R. 13, 15, 18. The ALJ then observed that "[t]hese statements and medical records indicate the claimant has not presented in a manner consistent with someone who is as limited as opined in the medical source statement." R. 18. Thus, the ALJ did not rely solely on anecdotal evidence of Reyes's activities to make his RFC finding. Rather, the ALJ discussed Reyes's daily activities to illustrate inconsistencies in the medical record and then further evaluated the medical opinions and nonmedical evidence to determine Reyes's RFC. See R. 17-18. Because the ALJ did not rely solely on an examination of daily activities and he provided a specific explanation for his findings, the ALJ properly considered Reyes's daily activities when determining his RFC.

Finally, Reyes contends the ALJ asked a hypothetical question of the VE that was "contrary to law," D. 12 at 16, because there must be "a medical opinion to support the medium level of work capacity" and "the ALJ's hypothetical must contain at a minimum the least restrictive limitations set forth by the medical evidence," id. at 15. Reyes asserts that the ALJ's finding that Reyes was not disabled is therefore invalid because the "ALJ based the Administrative denial on the testimony of this vocational expert." Id. at 12.

SSA regulations state that "[i]f any of the evidence in [the] case record, including any medical opinion(s), is inconsistent, [the ALJ] will weigh the relevant evidence and see whether

[the ALJ] can determine whether [the claimant] [is] disabled based on the evidence" in the record. 20 C.F.R. § 416.920b.   Furthermore, SSA policy states that an ALJ may make an RFC determination that conflicts with an opinion from a medical source as long as the ALJ explains why the opinion was not adopted, SSR 96-8p, 61 Fed. Reg. 34,474, because the ALJ is tasked with weighing conflicting evidence when assessing a claimant's RFC, see Seavey v. Barnhart, 276 F. 3d 1, 10 (1st Cir. 2001).   Thus, evidence in the record other than RFC assessments may be sufficient to support an ALJ's RFC determination.   Gordils, 921 F.2d at 329.

Here, the ALJ evaluated several medical source opinions and gave Dr. Pulaski and Fitzgerald's little weight, pointing to their inconsistency with the totality of the evidence and the contrary medical report of Dr. Shtasel.   R. 18-19.   As previously discussed, the ALJ provided good reasons for his decision and thoroughly explained why he did not adopt any of the medical source opinions.   The ALJ properly resolved conflicts in the record, supported his RFC determination with other substantial evidence in the record and explained his conclusions.   Therefore, he did not need a medical source's RFC assessment to corroborate his RFC finding.

As Reyes points out, the First Circuit has stated that "for a vocational expert's answer to a hypothetical question to be relevant, the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities," Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982).   In Arocho, the First Circuit elaborated that the ALJ "must both clarify the outputs (deciding what testimony will be credited and resolving ambiguities), and accurately transmit the clarified output to the expert in the form of assumptions." Id.   That is, the hypothetical should "identify the claimant's specific limitations" and "incorporate a fair representation" of them.   Musto v. Halter, 135 F. Supp. 2d 220, 232 (D. Mass. 2001). Furthermore, the First Circuit has also held that an ALJ is "entitled to credit the vocational expert's

testimony as long as there was substantial evidence in the record to support the description of claimant's impairments given in the ALJ's hypothetical to the vocational expert." <u>Berrios Lopez</u>, 951 F.2d at 429.

Here, the ALJ took into account that "the claimant's ability to perform all or substantially all of the requirements of [medium-level] work has been impeded by additional limitations."  R. 20.  The ALJ specified what the hypothetical individual would be able to lift and carry, how long he would be about to sit and stand, how frequently he could engage in other movements, how long he would be able to maintain pace and concentration and how he could relate to coworkers.  <u>See</u> R. 79-80.  In enumerating these specific limitations, the ALJ clarified the outputs and accurately transmitted said outputs to the VE.  Accordingly, the Court credits the VE's testimony and the ALJ's ultimate finding that Reyes was not disabled because the description of Reyes's impairments was supported by substantial evidence in the record.

## V.     Conclusion

For the above reasons, the Court GRANTS the Commissioner's motion to affirm, D. 17, and DENIES Reyes's motion to reverse, D. 11.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge